IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

UNITED STATES OF AMERICA

v.

DWAYNE ONQUE, MASHON ONQUE,
and NANCY WOLF-FELS

Defendants.

HONORABLE JEROME B. SIMANDLE

Criminal Action
No. 10-510 (JBS)

**OPINION**

APPEARANCES:

Paul J. Fishman, United States Attorney
    By: Matthew T. Smith, Assistant U.S. Attorney
        Jacqueline Carle, Assistant U.S. Attorney
OFFICE OF THE U.S. ATTORNEY
401 Market Street, 4th Floor
Camden, NJ 08101
    Attorney for the United States

Peter A. Levin, Esq.
1927 Hamilton Street
Philadelphia, PA 19130
    Attorney for Defendant Dwayne Onque

Anne C. Singer, Esq.
Jacobs Singer Kivitz & Herman LLC
34 Tanner Street
Haddonfield, NJ 08033
    Attorney for Defendant Mashon Onque

Paul J. Urbania, Esq.
494 Sycamore Avenue
Suite 203
Shrewsbury, NJ 07702
    Attorney for Defendant Nancy Wolf-Fels

**SIMANDLE, Chief Judge:**

**I.    INTRODUCTION**

On October 6, 2014, defendants Dwayne Onque, Mashon Onque,

and Nancy Wolf-Fels were found guilty after a four-week jury trial for their roles in a large-scale mortgage fraud conspiracy. The jury convicted all three defendants of conspiracy to commit wire fraud and also convicted defendant Dwayne Onque on one count of conspiracy to commit money laundering.

Defendants Dwayne Onque and Mashon Onque have filed motions for acquittal and for a new trial under Federal Rules of Criminal Procedure 29 and 33. Defendant Nancy Wolf-Fels has filed a motion for a new trial under Rule 33. For the reasons set forth below, Defendants' motions will be denied.

## II.  BACKGROUND

The Court assumes the parties' familiarity with the underlying facts of this case and recites briefly only those facts particularly relevant for deciding these motions.

On November 6, 2013, a federal grand jury returned a two-count Superseding Indictment ("Indictment") against seven individuals involved in the conspiracy. Count One charged Defendants Nancy Wolf-Fels, Dwayne Onque, Mashon Onque ("Defendants") with one count of Conspiracy to Commit Wire Fraud in violation of 18 U.S.C. § 1349. Count Two charged Defendant Dwayne Onque with one count of Conspiracy to Commit Money Laundering in violation of 18 U.S.C. § 1956(h).

Prior to trial, Defendants each filed a motion to exclude

2

certain evidence of uncharged conduct the Government sought to admit under Federal Rule of Evidence 404(b). The Court denied the motions and permitted the Government to offer evidence of Defendants' conduct in several other real estate transactions for limited purposes. [Docket Items 156, 157, & 158.]

The Indictment alleged that Defendants intentionally conspired and agreed with others to devise a mortgage fraud scheme and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises. According to the indictment, the ringleaders of the conspiracy, which included Nicholas Tarsia, Jr., Timothy Ricks, Darryl Henry, and Jerry Smith, found financially distressed properties, induced lenders to loan funds in excess of the actual value and price of the properties using false sales agreements and loan applications and straw buyers, and, when the properties closed, pocketed the excess funds that were released by the mortgage lenders based on the inflated price. The Indictment charged the defendants with participating in over two dozen fraudulent transactions that occurred between October 2006 and May 2008, although the Government alleges that the scheme continued for much longer. The Government alleges that members of the conspiracy caused approximately 15 million dollars in fraudulent mortgage loans to be released.

The conspiracy required a number of individuals in a

variety of different roles. Tarsia, Ricks, Henry, and others recruited straw purchasers to buy distressed properties at a price that was reported to lenders as much higher than the actual sale price. With the help of co-conspirators whose job it was to create false documents, the straw purchasers would submit loan applications with supporting documents reflecting inflated incomes, fictitious jobs or elevated job titles, false bank account balances, and fictitious assets. The loan applications were then submitted to various lenders with the assistance of mortgage brokers. After the mortgages were approved, title clerks prepared closing documents, which included standard HUD-1 Settlement Statements ("Hud-1 statements") used by lenders to verify the accuracy of loan applications and sales agreements and to certify that loans were properly disbursed. The HUD-1 statements in this case misrepresented the value of the sale and falsely stated that the borrowers brought certain deposits and down payments to the closing when in fact they brought nothing. These false representations played an important role in convincing lenders that the purchasers had a financial stake in the property and were less likely to default. Once the closings went through and lenders released the money, title clerks distributed the proceeds and the co-conspirators received the funds released by the lenders that were in excess of the actual sale price.

4

At trial, the government presented the following evidence linking defendants Dwayne Onque, Mashon Onque, and Nancy Wolf-Fels to the conspiracy.

**A.    Dwayne Onque**

Dwayne Onque ("Dwayne") was a straw purchaser who made an agreement with co-conspirators to submit loan applications and purchase properties in his name. Co-conspirator Tim Ricks, who was a childhood friend of Dwayne's, testified that he approached Dwayne to be a potential buyer of properties and made an arrangement with Dwayne to be paid in exchange for using Dwayne's name on loan applications. (9/17 T. 963:13-965:17.) Ricks testified that there was an "unspoken" understanding that Dwayne would apply for the mortgage in his name but Ricks or others would bring the necessary down payments to the closing. (Id. T. 968:20-21; T. 1001:17-21.)

FBI Special Agent Scott Stefanowicz testified that Dwayne signed five loan applications over a period of nine months that contained false information about his job title, income, address, and use of the property. For example, Agent Stefanowicz testified that Dwayne submitted loan applications stating that he was vice president of a company called Diamond Disposal when he was actually a truck driver with the company. (9/11 T. 269:12-270:23.) Similarly, Dwayne's former boss, Daniel Plaxe, testified that Dwayne asked him to inflate Dwayne's title at the

company to "more than just a driver" and lie about his income on an employment verification form in connection with Dwayne's mortgage application. (9/22 T. 1149:5-21.)

IRS Special Agent Scott Smith, who interviewed Dwayne in 2008, testified that Dwayne admitted to Smith that he was working with Ricks. Dwayne told Smith that Ricks would pay Dwayne money each time Dwayne's name was used to purchase a property, and that Nick Tarsia would temporarily deposit money into Dwayne's bank account in order to make it appear to a lender that Dwayne had more money. (9/29 T. 1724:12-1725:23.) Dwayne also admitted to Smith that he had asked his employer, Daniel Plaxe, to lie about Dwayne's employment to make it appear to lenders that Dwayne had a better job. (9/29 T. 1725:24-1726:8.) Dwayne told Smith that he brought no down payments or funds of his own to closings, in contrast to what was stated in the HUD-1 statements. (9/29 T. 1726:9-19.)

Once the funds were deposited in a title company's escrow account, Dwayne and his co-conspirators extracted proceeds from the fraud through wire transfer checks to Tarsia, Ricks, and Henry. Tarsia and Ricks then transmitted a portion of those proceeds to Dwayne. The Government presented evidence of checks from Ricks to Dwayne, which Ricks testified was payment to Dwayne for allowing Dwayne's name to be used on the mortgage applications. (T. 994:21-996:2, 1006:21-1007:5, 1014:20-1-15:6,

1017:22-1018:3, 1021:20-1022:2; Gov't Ex. 512A (check for $15,000), 611A (check for $18,000), 717 (check for $12,000), 823 (check for $15,000), 922A (check for $3500).)

   B.  **Mashon Onque**

Mashon Onque ("Mashon"), Dwayne's sister, worked as a Title Officer at Tri-State Title Agency, Inc. in Montclair, New Jersey. Her responsibility as a title officer included overseeing the signing of closing documents, completing a HUD-1 Settlement Statement which verified the accuracy of the loan applications and terms of the transaction, and ensuring that the money was distributed according to the HUD-1. Each HUD-1 that Mashon signed required her to acknowledge that "The HUD-1 Settlement Statement which I have prepared is a true and accurate account of this transaction. I have caused or will cause the funds to be disbursed in accordance with this statement."

At trial, the Government presented evidence that Mashon was the title clerk for several fraudulent real estate transactions at which she signed inaccurate HUD-1 Settlement Statements for straw purchasers recruited by the co-conspirators. Specifically, Mashon served as a title agent for a transaction in October 2006 for a property at 52 Starr Court in Middletown, New Jersey, purchased in her brother's name (Gov't Ex. 505); and one in May 2008 for a property at 106 South 7th Street in Newark, New

7

Jersey, purchased by straw buyer Kevin Livingston. (Gov't Ex. 2007.) In addition, the Government presented Rule 404(b) evidence showing that in September 2006, Mashon acted as the title agent for three other transactions involving two other properties, in September 2006, December 2006, and February 2007. Two of those transactions involved Mashon's brother Dwayne. (Gov't Ex. 3500A, 3600, 3700.) The Government also introduced evidence showing that Mashon deposited into her own account several checks made out to Dwayne around the time of the February 2007 transaction. (Gov't Exs. 3603, 3604, 3605.) The Government finally presented evidence that Mashon notarized the closing documents for transactions involving straw buyers Kevin Livingston and Robert Allen, Jr., even though Livingston and Allen were not present. (See 9/22 T. 1064:20-1067:5; Gov't Br. 14.) Ricks testified that he saw Mashon notarize a number of documents for Livingston outside of his presence. (9/22 T. 1067:6-9.)

The Government introduced HUD-1 settlement statements and disbursement statements for these transactions, showing that after funds were released by the banks, Mashon directed them to be distributed in a manner that was inconsistent with what she certified was in the HUD-1 and loan applications. (Compare Exs. 513, 2008, 3601, 3701 with Exs. 505, 2007, 3600, 3700.)

Tim Ricks testified that he recruited Mashon and asked her

8

to participate in his scheme. (9/17 T. 953:23-954:2.) He also testified that during the closing of one property, Mashon never questioned why Dwayne, the purchaser, brought no down payment to the closing and never questioned the distribution of nearly $100,000 to co-conspirator Tarsia even though that was not listed on the HUD-1. For her work, Mashon was paid normal commission fees.

### C.   Nancy Wolf-Fels

Nancy Wolf-Fels was employed as a mortgage broker by Mortgage Now, Inc. in Forked River, New Jersey, at the time of the conspiracy. The Government alleged that she helped the co-conspirators obtain mortgage loans by submitting loan applications that were based on false information and fraudulent documents. At trial, co-conspirators Larry Barker, Robert Allen Jr., and Kevin Livingston, testified that in 2007, Nancy Wolf-Fels processed several loan applications submitted on their behalf with false information about their employment history, financial assets, and purpose of the home purchases. Wolf-Fels received a standard commission for each of these transactions.

The Government also presented testimony from several other co-conspirators, including Darryl Henry, Jerry Smith, Elizabeth Hidalgo, and Donald Cromwell that Wolf-Fels had assisted with fraudulent loan applications for other properties in 2004 and 2005. For example, Henry testified that Wolf-Fels instructed

Henry and others about the financial information that loan
applicants needed in order to be approved. (9/15 T. 528:8-534:8;
558:21-562:2; 606:16-23.) He also testified that Tarsia directed
how Wolf-Fels would be paid. (9/15 T. 555:19-556:3.) Elizabeth
Hidalgo, who was responsible for creating fraudulent loan
documents, testified that she had a conversation with Wolf-Fels
about the specific asset numbers needed on loan applications and
documents. (9/16 T. 829:2-13.) The Government also introduced
three checks from Henry to Wolf-Fels in 2004, which Henry
testified was given to Wolf-Fels on top of her standard
commission fee for her part in the conspiracy. (Gov't Exs. 2202,
2304, 2400.)

D.     **Procedural History and Plaintiff's Arguments**

The three defendants, each separately represented by
counsel, were tried together in a single trial which commenced
on September 8, 2014 and concluded on October 6, 2014. A jury
found Wolf-Fels, Mashon Onque, and Dwayne Onque guilty of
conspiracy to commit wire fraud (Count One). The jury also found
Dwayne Onque guilty of conspiracy to commit money laundering
(Count Two).

All three defendants filed motions for acquittal or new
trial. Mashon and Dwayne raise some of the same trial errors.
They both argue that the evidence was insufficient to support
their convictions, and Dwayne additionally contends that the

10

verdict was against the weight of the evidence. Both Mashon and Dwayne also argue that a new trial must be granted because the use of a willful blindness jury instruction was reversible error, as was the instruction on the use of co-conspirator statements made in the defendant's absence. They also argue that the Court erred in allowing the Government to introduce a summary chart summarizing the real estate transactions at trial.

In addition, Mashon argues that the Court erred in admitting certain Rule 404(b) evidence about Mashon's involvement in uncharged real-estate purchases; and that the government's closing and rebuttal mischaracterized certain testimony about Mashon and misstated the law.

Wolf-Fels does not join in these arguments. She argues only that a new trial must be granted under Rule 33 because a newly discovered invoice for "re-roof[ing] work" done by Wolf-Fels' deceased husband calls into question the veracity of Darryl Henry's testimony, and because Darryl Henry committed perjury.

The government filed a single response addressing each of Defendants' arguments, arguing that these post-verdict motions be denied. The Court heard oral arguments on these motions on December 19, 2014.

## III. DISCUSSION

### A. Standard of Review

Under Federal Rule of Criminal Procedure 29, a judgment of

11

acquittal must be entered for any offense "for which the evidence is insufficient to sustain a conviction." Fed. R. Crim. P. 29(a). The defendant bears a heavy burden in challenging her conviction on this ground. The standard of review is "particularly deferential" to the jury verdict. United States v. Cothran, 286 F.3d 173, 175 (3d Cir. 2002) (quoting United States v. Dent, 149 F.3d 180, 187 (3d Cir. 1998)). Not only must the evidence be considered in light most favorable to the government, all credibility issues must be resolved in the Government's favor. Id. Moreover, the court must affirm the verdict as long as a rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. United States v. Rawlins, 606 F.3d 73, 80 (3d Cir. 2010). In other words, the verdict must be upheld as long as the evidence does not "'fall below the threshold of bare rationality.'" United States v. Caraballo-Rodriguez, 726 F.3d 418, 431 (3d Cir. 2013) (en banc) (quoting Coleman v. Johnson, 132 S. Ct. 2060, 2065 (2012)).

Rule 33 allows the court to "vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a). In general, motions for a new trial "should be granted sparingly." United States v. D'Amario, 2007 WL 928473, at *5 (D.N.J. Mar. 26, 2007) (citing United States v. Copple, 24 F.3d 535, 547 n. 17 (3d Cir. 1994)). In considering a Rule 33

12

motion, the Court "may weigh the evidence, but may set aside the verdict and grant a new trial only if" it determines that the verdict constitutes a miscarriage of justice, or that a trial error had a substantial influence on the verdict. United States v. Stewart, 325 F.Supp.2d 474, 485 (D. Del. 2004). In analyzing a verdict under Rule 33, the Court must exercise its own judgment in assessing the Government's case, and does not view evidence favorably to the Government. United States v. Johnson, 302 F.3d 139, 150 (3d Cir. 2002).

Motions for a new trial based on weight of the evidence are similarly "not favored"; they are "granted sparingly and only in exceptional cases." United States v. Brennan, 326 F.3d 176, 189 (3d Cir. 2003) (quoting Government of Virgin Islands v. Derricks, 810 F.2d 50, 55 (3d Cir. 1987)). A district court may order a new trial "only if it believes that there is a serious danger that a miscarriage of justice has occurred – that is, that an innocent person has been convicted." United States v. Salahuddin, 765 F.3d 329, 346 (3d Cir. 2014) (internal quotations and citation omitted).

**B. Mashon Onque**

### i. The Evidence was Sufficient to Sustain the Conviction

Mashon argues that acquittal is warranted because the evidence was insufficient to show that she knew about the

fraudulent scheme, was a party to the conspiracy, or intended to participate in it. (Br. in Support of Mashon Onque's Mot. for Judgment of Acquittal or for a New Trial ("M.O. Br.") 2-25.)

To establish a charge of conspiracy, the Government must prove (1) a unity of purpose (2) an intent to achieve a common illegal goal, and (3) an agreement to work towards that goal, which the defendant knowingly joined. United States v. Boria, 592 F.3d 476, 481 (3d Cir. 2010); United States v. Pressler, 256 F.3d 144, 149 (3d Cir. 2001). In particular, the Government must show that the defendant had knowledge of the specific illegal objective of the conspiracy and intended to participate in the fraudulent scheme Id.; United States v. Chaffo, 452 Fed. Appx. 154, 159 (3d Cir. 2011).

There can be no conspiracy without evidence that the defendant agreed to work with someone else, but in a conspiracy, "rarely is there direct evidence of a qualifying agreement." Pressler, 256 F.3d at 149. Consequently, an agreement to defraud is usually proved through circumstantial evidence. United States v. Caraballo-Rodriguez, 726 F.3d 418, 431 (3d Cir. 2013); United States v. Chaffo, 452 Fed. Appx. 154, 159-60 (3d Cir. 2011). Circumstantial evidence is "evidence of related facts and circumstances from which it appears as a reasonable and logical inference, that the activities of the participants . . . could not have been carried on except as the result of a preconceived

14

scheme or common understanding," United States v. Kapp, 781 F.2d 1008, 1010 (3d Cir. 1986), and may include, for example, evidence of a continuing personal or professional relationship between the principal architects and the defendant, the existence of "excessive financial gain" or over-generous compensation, and the defendant's role in the overall operation. United States v. Pearlstein, 576 F.2d 531, 541-42 (3d Cir. 1978). Because "[s]ecrecy and concealment are essential features of successful conspiracy," the law "rightly gives room for allowing the conviction of those discovered upon showing sufficiently the essential nature of the plan and their connections with it, without requiring evidence of knowledge of all its details or of the participation of others." Blumenthal v. United States, 332 U.S. 539, 557 (1947).

The evidence at trial was sufficient to show that Mashon Onque agreed to and knowingly participated in the conspiracy. A reasonable jury could have found that Mashon knew of the illegality of the scheme based on how she handled the inconsistent HUD-1 and disbursement statements. See Kapp, 781 F.2d at 1011 (defendant's act in furtherance of conspiracy suggested agreement because it was done with knowledge of some illegality). Mashon knew that the money was not accurately recorded in the HUD-1, yet she still signed her name to the certification on the bottom of each HUD-1 that it was a true and

15

accurate account of the transaction. Mashon also authorized the disbursement of funds to individuals not listed on the HUD-1 when as a title clerk she should have known that this was not in accordance with the lender's requirements and the certification on the HUD-1 itself.

Defendant's argument that there was evidence in the record suggesting that her conduct was entirely innocent is unpersuasive. She points to testimony that Tri-State provided no training on closings; however, Mashon's co-worker Joanne Coyne testified to knowing that they were not allowed to disburse funds to individuals not listed on the HUD-1. (9/23 T. 1306:2-20.) Mashon also notes that the "side" arrangements to transfer money to unlisted individuals were known to all the parties. But it was not entirely clear that these arrangements were out in the open; the jury also heard evidence from the Government that the side authorizations were omitted from the lender's file because "[the conspirators] didn't want the lender to know about this." (9/30 T. 1897:9.) Although Defendant points out that the lack of oversight and training at Tri-State could suggest Mashon's innocence, a reasonable jury could draw an equally valid inference that Mashon took advantage of the lack of oversight at Tri-State to engage in unlawful conduct.[1]

---

[1] Mashon makes a vigorous attempt to parse the evidence in the record and show that each piece could have been interpreted more

16

The Government presented evidence showing that Mashon was a closing agent in not just one, but several irregular real estate transactions involving the same people and she performed the same kinds of tasks during each transaction. Her repeated engagement in unlawful behavior tends to make more likely the fact that she was aware of her role and did not make an innocent mistake. See United States v. Claxton, 685 F.3d 300, 310 (3d Cir. 2012) (evidence that defendant facilitated several drug transactions makes it more likely that defendant knew the true nature of the criminal enterprise); United States v. Chaffo, 452 Fed. Appx. 154, 160 (3d Cir. 2011) (evidence that defendant participated in numerous fraudulent real estate transactions suggested that his actions were "not a simple oversight or mistake, but rather a calculated and deliberate decision to participate"); see also United States v. Smith, 294 F.3d 473, 478 (3d Cir. 2002) (reasonable juror could conclude that there was a tacit agreement among a group of people when they engage

---

innocently. Even if so, the jury evidently rejected this interpretation and it is not this Court's role to revisit it. See United States v. Brodie, 403 F.3d 123, 133 (3d Cir. 2005) ("Courts must be ever vigilant in the context of [Rule 29] not to usurp the role of the jury by . . . substituting its judgment for that of the jury."). To sustain a conviction for conspiracy, the "contention that the evidence also permits a less sinister conclusion is immaterial. . . . [T]he evidence does not need to be inconsistent with every conclusion save that of guilt." United States v. Dent, 149 F.3d 180, 188 (3d Cir. 1998). The Court need only find that the evidence, taken as a whole, was sufficient for a rational trier of fact to have found the

in "so many unusual acts").

There were other irregularities that suggested Mashon's knowledge and intent. In addition to acting as a title clerk, Mashon also falsely notarized closing documents for Ricks. Moreover, the Government presented evidence that Mashon helped her brother purchase two properties for significant sums of money within months of each other without questioning how Dwayne could have afforded the purchases on his salary as a truck driver. As with the other transactions, Mashon authorized the closing even though her brother the buyer brought no money of his own. Mashon argues that there was no evidence she knew that she was helping to defraud lenders, but the precise nature of her actions suggests otherwise. The Government showed at trial that Mashon's conduct contradicted fundamental closing procedures and that it was known that lenders relied on certifications that buyers brought their own money to safeguard against the risk of default. (9/24 T. at 1426:14-23.) A reasonable jury could have inferred from this evidence that Mashon know of the conspiracy's ultimate goal.

Moreover, the evidence showed Mashon benefited from the fraudulent scheme since she she cashed three checks from Dwayne for her participation. (Gov't Exs. 3603, 3604, 3605.) The sums of the checks, which ranged from $400 to 1,000, were small

---

essential elements of the crime beyond a reasonable doubt.

compared to the amount other co-conspirators received.
Nonetheless, a rational trier of fact could have concluded that
the commissions Mashon received from the sales and the
anticipation of future commissions were probative of motive for
participating in the conspiracy. See Chaffo, 452 Fed. Appx. at
156 (evidence was sufficient to uphold conviction of wire fraud
and conspiracy to commit wire fraud where defendant, who served
as the closing attorney for fraudulent mortgage deals, signed
off on HUD-1 transactions that were inaccurate, disbursed funds
not in accordance with the HUD-1, and was paid normal rates and
fees for his work, among other things). In this case, there was
evidence that Mashon made substantial commissions on each
closing. The closing agents in her firm, according to her co-
worker Joanne Coyne, earned salary and commission, and where the
agent brought in the client – such as Ricks' associates
including her brother – the commission amounted to 40 percent of
the title insurance payment. (9/23 T. 1293:11-94:22.)

     Finally, the jury also heard testimony from Ricks that
Mashon and Ricks had a tacit agreement. Although Ricks did not
explicitly tell Mashon that the transactions were fraudulent,
Ricks testified that he asked Mashon "to participate in criminal
activity" and that he and Mashon had an "unspoken"
understanding. (9/17 T. 953:23-25.) Based on Ricks' testimony
that Mashon was a participant in their scheme, a rational jury

could have inferred that Mashon was a member of the conspiracy. See Claxton, 685 F.3d at 309-10 (finding that co-conspirator's statement at trial that defendant was a "member of the organization" is "strong circumstantial evidence of [defendant's] knowing involvement" in conspiracy and noting that admitted co-conspirator's testimony regarding who was a co-conspirator "remains highly pertinent to the question of the defendant's knowing complicity in the crime."); see also United States v. Hernandez, 962 F.2d 1152, 1155-57 (5th Cir. 1992) (co-conspirators' testimony regarding defendant's participation in conspiracy was sufficient to sustain defendant's conviction).

This case is distinguishable from United States v. Pearlstein, 576 F.2d 531 (3d Cir. 1978), which Mashon cites for support. The defendants in Pearlstein were low-level salesmen who were hired by conspirators to sell pens to distributors and later convicted of mail fraud. The conspirators ran a fraudulent business and gave the salesmen fake promotional materials, but the salesmen were not told that the business was fake. Id. at 538. The Third Circuit held that there was insufficient evidence to show that the defendants knew or should have known about the conspirators' fraud. Central to this finding was evidence that defendants were kept completely in the dark about the managerial side of the company. Id. at 541. They were forbidden from reading company mail or perusing company files and played no

20

part in creating the promotional materials. They had no basis to
suspect that the promotional materials they were given were
false and misleading. Id. at 542-43.

By contrast, there was more than enough evidence in the
record to establish that Mashon Onque engaged in actions she
knew deceived lenders and were against the law. That she
repeatedly engaged in these types of transactions with known co-
conspirators, did so without asking any questions about the
obvious irregularities, and was identified by a co-conspirator
as a member of the conspiracy provides additional support for a
conclusion that Mashon knew that she was involved in an illegal
enterprise. A reasonable jury could also find the knowledge
requirement met on a theory of willful blindness because the
evidence supports a conclusion that Mashon "deliberately ignored
the high probability" that she was participating in a criminal
conspiracy to defraud lenders, as will be explained below.
United States v. Smith, 183 Fed. Appx. 264, 269 (3d Cir. 2006).

Taken as a whole, the evidence was sufficient to permit a
rational jury to find Mashon Onque guilty of conspiracy to
commit wire fraud. The Court will deny Defendant's motion for
acquittal.[2]

---

[2] To the extent Mashon challenges her conviction under Rule 33
for being against the weight of the evidence, the Court must
also deny that claim. Viewed neutrally, the evidence against
Mashon was not so weak to suggest that the jury wrongly

21

### ii. The Court did not Err in Giving a Willful Blindness Instruction

An instruction on willful blindness may be used in a case to prove that a defendant acted knowingly and willfully by showing that she or he had knowledge or awareness of certain facts or circumstances. United States v. Wert-Ruiz, 228 F.3d 250, 255 (3d Cir. 2000). A willfully blind defendant is "one who takes deliberate actions to avoid confirming a high probability of wrongdoing and who can almost be said to have actually known the critical facts." Global-Tech Appliances, Inc. v. SEB S.A., 131 S. Ct. 2060, 2070-71 (2011). The willful blindness instruction is justified as long as there was sufficient evidence that a defendant "deliberately avoided learning the true facts" or "closed his eyes to what would otherwise have been obvious to him." United States v. Stewart, 185 F.3d 112, 126 (3d Cir. 1999); see also United States v. Caraballo-Rodriguez, 726 F.3d 418 (3d Cir. 2013); United States v. Bansal, 663 F.3d 634, 669 (3d Cir. 2011); Wert-Ruiz, 228 F.3d at 255.

Willful blindness "is not to be equated with negligence or a lack of due care," Wert-Ruiz, 228 F.3d at 255, since willful blindness is a "subjective state of mind that is deemed to satisfy a scienter requirement of knowledge." United States v. One 1973 Rolls Royce, 43 F.3d 794, 808 (3d Cir. 1994).

---

convicted an innocent person.

Following the Third Circuit Model Jury Instructions, the Court in this case instructed the jury that it may find willful blindness if it finds evidence that the defendant subjectively believed there was a high probability that a fact existed, and "consciously took deliberate actions to avoid learning about the existence of this fact or circumstance." (10/1 T. 2029:5-7.) Mashon argues that a willful blindness instruction was inappropriate here because there was no evidence that she took "affirmative steps" to avoid learning the truth. (Br. of M.O. 33 (citing Global-Tech Appliances, Inc. v. SEB S.A., 131 S. Ct. 2060, 2070 (2011)).)

The Court does not agree. The evidence showed that Mashon Onque ignored fundamental real estate closing protocols in numerous closings. As the title agent for each closing, she certified that inaccurate HUD-1 forms were accurate, looked the other way when buyers brought no down payment, and facilitated disbursements of money that were unauthorized, in one case doing so even after her co-worker stated that it should not be done. In addition, she notarized closing documents for a co-conspirator even though the documents were not signed in her presence. As the Court has already explained, the evidence was sufficient for a jury to find that Mashon likely knew that her actions were unlawful, yet not once did she question the things she was asked to do. Evidence of her taking affirmative steps to

23

facilitate these irregular transactions, combined with her failure to ask any questions, was sufficient to show that Mashon took affirmative steps to avoid learning the truth, and supports a willful blindness instruction. See Wert-Ruiz, 228 F.3d at 258 (willful blindness instruction was appropriate because jury could have concluded that defendant "willful[ly] refus[ed] to connect the dots" by not asking any questions in the face of suspicious practices such as using code words for money, minimizing large dollar amounts, and receiving large amounts of cash in gym bags); Stewart, 185 F.3d at 126 (willful blindness instruction was justified in mail fraud and money laundering where defendant argued that he relied upon the findings of solvency in state examinations and audit reports but jury could have reasonably concluded that defendant "recognized the likelihood of insolvency yet deliberately avoided learning the true facts"); see also United States v. Appolon, 695 F.3d 44, 64-65 (1st Cir. 2012) (willful blindness instruction was justified where, among other things, defendant processed falsified mortgage loan applications on behalf of straw buyers and collected commissions and knowingly misrepresented information on the loan applications). Accordingly, the Court gave a willful blindness instruction that was legally correct and fit the circumstances of this case.

### iii. The Government did not Mischaracterize Testimony or Law

Mashon argues that the Government mischaracterized certain testimony and law in closing and rebuttal and that these mischaracterizations prejudiced the case, warranting a new trial.

A prosecutor's comments during summation or rebuttal are improper if the statements mischaracterize certain evidence or are based upon evidence not in the record. United States v. Brown, 765 F.3d 278, 296 (3d Cir. 2014); Wright et al., Federal Rules of Criminal Procedure § 588 (4th ed. 2011) (noting that it is misconduct for prosecutor "to make an assertion to the jury of fact . . . unless there is evidence of that fact" and prosecutor also should not "import his own testimony into the trial" or "misstate the law in closing argument."). However, not all improper comments require reversal. The Supreme Court has emphasized that "a criminal conviction is not to be lightly overturned on the basis of a prosecutor's comments standing alone, for the statements or conduct must be viewed in context." United States v. Young, 470 U.S. 1, 11 (1985). In other words, the court must analyze comments on a "case by case basis, in the context of the entire trial." United States v. Zehrbach, 47 F.3d 1252, 1267 (3d Cir. 1995) (en banc) (citing Young, 470 U.S. at 11). Moreover, in summation, a prosecutor is "entitled to

25

considerable latitude . . .  to argue the evidence and any

reasonable inferences that can be drawn from that evidence."

United States v. Werme, 939 F.2d 108, 117 (3d Cir. 1991).

Ordinarily, the court will reverse if defendant can show

that she has suffered prejudice. Zehrbach, 47 F.3d at 1267.

Here, however, because Mashon did not object to the prosecutor's

comments at closing or rebuttal, the Court will review for plain

error. United States v. Harris, 471 F.3d 507, 512 (3d Cir.

2006); United States v. Wright, 845 F. Supp. 1041, 1065 (D.N.J.

1994). When reviewing claims of prosecutorial misconduct under

the plain error standard, the question is whether the

prosecutor's comments caused "substantial prejudice" to the

defendant "by so infecting the trial with unfairness as to make

the resulting conviction a denial of due process." Brown, 765

F.3d at 296 (internal quotation marks and citations omitted).

Alleged Misrepresentations of Fact

According to Mashon Onque, the prosecutor made several

misstatements of fact. Mashon notes that in closing and again in

closing rebuttal, the prosecutor emphasized Ricks' testimony

that he "recruited [Mashon] to participate in criminal

activity." (10/2 T. 2093:11-12; 10/2 T. 2169:1-14.) Mashon

argues this statement was misleading because it implied that

Ricks explicitly asked Mashon to do something illegal. On the

contrary, Ricks testified that he never told her of his

26

fraudulent scheme and "never said to her, let's engage in a criminal conspiracy." (9/22 T. 1122:11-17.) The Government's statement, however, cannot be considered misleading because it essentially rephrased Ricks' own testimony. At trial, Ricks was specifically asked, "Did you ask Mashon Onque to participate in criminal activity?" and "Did you recruit [Mashon and Dwayne] into this activity?" He responded "yes" to both questions. (9/17 T. 953:23-954:4.) The prosecutor's statement in closing closely tracked this language, and in closing rebuttal, the prosecutor cited directly from the trial transcript.

Mashon also contends that the prosecutor mischaracterized the evidence when he stated in closing that Mashon and Ricks were "childhood friends who have grown up together." However, this characterization was fair since Ricks testified that he knew Mashon since he was a child and knew her well. (9/17 T. 949-950.) As for the prosecutor's statement during closing rebuttal that Joanne Coyne, Mashon's former co-worker at Tri-State Title, made a commission of "40% of the title insurance" when the actual commission was somewhat smaller, that inaccuracy was harmless since other documents in evidence showed exactly how much Mashon received for her commission. These alleged misstatements did not cause substantial prejudice. At most, they inflated the strength of certain circumstantial evidence of Mashon's knowledge and intent, and did not relate any core

27

aspect of the defendant's case. Moreover, the court cautioned jury members that the arguments of counsel are not evidence, and that they must not consider anything that was not in evidence. These instructions were sufficient to cure any minor error which might have occurred here. Zehrbach, 47 F.3d at 1267.

The prosecutor also stated that Ricks "let [Mashon] know enough to show that this is a fraud and that she should help her brother out and that she should proceed with this transaction, just enough so that she could play her role. She could play her part. Like James Ezeilo said when he testified, that everyone would just stay in their lane. Everyone had their role." (10/2 T. 2094.) It is well established that the Government has "considerable latitude" in the inferences it may reasonably suggest to the jury during summation. Werme, 939 F.2d at 117; United States v. Green, 25 F.3d 206, 210 (3d Cir. 1994). Even though this statement was arguably imprecise, the inference that Mashon and Ricks had an understanding about the fraudulent nature of the scheme was supported by the evidence. The statement was made during a broader point about the secret nature of a conspiracy, and the Government quoted directly from Ricks' testimony at trial that "a lot of things were unspoken." (10/2 T. 2093:15.) Placed in context, it was therefore clear that the Government did not mean to suggest that Ricks and Mashon had an explicit conversation. The Government's comments

28

were by no means unreasonable in light of the evidence presented at trial. <u>United States v. Lee</u>, 612 F.3d 170, 194 (3d Cir. 2010). This statement was also harmless, since at most it showed that Mashon was aware of the criminal conspiracy, but as already noted, there was other independent evidence in the record to show Mashon's knowledge and intent. The Court also instructed the jury prior to closing not to consider statements and arguments by a lawyer as evidence, and to to disregard counsel's version of evidence if it did not square with their own recollection. (10/1 T. 2000:13-2001:14.) Moreover, the Government's closing cited much of that additional evidence, which substantially mitigated the potential harm caused by this single statement.

<u>Alleged Misrepresentations of Law</u>

Mashon Onque's arguments that the prosecutor misrepresented the law during closing and rebuttal are equally without merit. With respect to the prosecutor's statement about the object of the conspiracy, the record shows that the prosecutor did not mislead the jurors on its meaning. The transcript clearly shows that the prosecutor defined "object of the conspiracy" by reciting verbatim the Court's jury instructions on that term. (10/2 T. 2169:15-2170:16.)

Nor was the prosecutor's reading of only a portion of the instruction on willful blindness misleading. The prosecutor is

not required to read a jury instruction in full. Moreover, the
Court's complete instructions to the jury on willful blindness,
its instruction to the jury to apply the instructions as whole,
and its admonition to the jury to disregard contrary
characterizations of the law by counsel, were sufficient to cure
any error. See United States v. Staten, 2013 WL 1703396, at *13
(M.D. Pa. April 19, 2013) (holding that court's instructions
cured any risk of prejudice from Government counsel's
misstatements in closing about the standard of proof and noting
that "'juries are presume to follow [the court's]
instructions.'" (citing Richardson v. Marsh, 481 U.S. 200, 211
(1987))).

The Court holds that these statements, either individually
or on the whole, did not cause substantial prejudice. "Trials
are rarely, if ever, perfect and improprieties of argument by
counsel to the jury do not call for a new trial unless they are
so gross as probably to prejudice the defendant and the
prejudice has not been neutralized by the trial judge before
submission of the case to the jury." United States v. Leftwich,
461 F.2d 586, 590 (3d Cir. 1972). In light of the curative
instructions given, the scope of the objectionable comments and
their relationship to the entire proceeding, and the strength of
the evidence supporting Defendant's conviction, the Court does
not find that these statements "so infect[ed] the trial with

30

unfairness as to make the resulting conviction a denial of due process." Brown, 765 F.3d at 296; Zehrbach, 47 F.3d at 1265.

### iv. Admission of the Government's Summary Chart was not Improper or Unduly Prejudicial

Federal Rule of Evidence 1006 allows a party to use a summary chart to "prove the content of voluminous writings, recordings, or photographs that cannot be conveniently examined in court." Fed. R. Evid. 1006. Mashon Onque argues that the Government's summary charts, which were introduced near the end of the Government's case to summarize the different transactions and show the movement of funds related to each closing, should not have been admitted and were unduly prejudicial. (Br. of M.O. 38-39.)

Rule 1006 "does not require 'that it be literally impossible to examine all the underlying records [before a summary chart may be utilized], but only that in-court examination would be an inconvenience.'" United States v. Bertoli, 854 F. Supp. 975, 1050 (D.N.J. 1994) (quoting United States v. Possick, 849 F.2d 332, 339 (8th Cir. 1988)) (overturned on other grounds). In this case, the Government admitted into evidence hundreds of exhibits related to over two dozen different property transactions. The underlying documents, which included HUD-1 statements, closing documents, wire receipts, photographs, checks, bank statements, and loan

applications for each property, numbered in the thousands of pages. The Government's exhibit list alone was 34 pages long. It was clear that a jury could not have conveniently examined the documents, and the Court finds that it was proper to allow jurors the use of summary charts. The fact that the underlying documents were already in evidence does not change this reasoning. See Meister v. C.I.R., 504 F.2d 505, 513 (3d Cir. 1974) ("Summaries of voluminous business records are admissible in evidence where the records are already in evidence, permitting independent verification of the summaries.").

The charts were also not misleading or prejudicial because they failed to note each and every payment that was made for each transaction. The omitted payments, such as taxes, water bills, or prior mortgages, were not probative of the issues at trial. Nor was Government Exhibit 9002, which used arrows to indicate that three checks received by Dwayne went to Mashon, misleading or prejudicial. The underlying evidence showed that Mashon actually deposited into her bank account the checks paid to Dwayne for the closing at 93 N. 15th Street. (See Gov't Exs. 3603, 3604, 3605.) The arrows therefore properly showed what was already in evidence: that Dwayne's checks were cashed by Mashon. Accordingly, the Court finds that the summary charts were properly admitted.

**v. The Court did not Err in Its Instruction to the Jury on Considering Statements by Co-Conspirators**

Mashon Onque finds fault with the Court's instructions to the jury that statements made by co-conspirators may be used as evidence against Mashon.[3] She contends that the instruction was

---

[3] No defendant has argued that any particular evidence was improperly admitted under Fed. R. Evid. 801(d)(2)(E), nor was such an objection made at trial when such statements were being adduced. Likewise, neither the Government or defense counsel requested during the trial that the Court address the admissibility of such evidence under Bourjaily v. United States, 483 U.S. 171, 175 (1987). Where such a question is raised, the Court will determine admissibility under Rule 801(d)(2)(E) by a preponderance of the evidence, id. at 175-76, and there is no requirement, in making the determination, that the Court must consider only evidence independent of such statements. Id. at 176-181. The standards for admitting a co-conspirator's statement over an objection under Rule 801(d)(2)(E) requires a showing of "evidence that there was a conspiracy involving the declarant and the nonoffering party, and that the statement was made 'during the course of and in furtherance of the conspiracy.'" Bourjaily, 483 U.S. at 175. Rule 801(d)(2)(E) was amended in 1997, in response to Bourjaily, to clarify that the challenged statement itself "must be considered but does not by itself establish . . . the existence of the conspiracy or participation in it under (E). Fed. R. Evid. 801(d)(2)(E). Thus, there must be a showing of "some evidence in addition to the contents of the statement," supporting the existence and membership prongs. Fed. R. Evid. Advisory Comm. Notes (1997). In any event, as there was no objection to admissibility under Rule 801(d)(2)(E), no explicit Bourjaily analysis was triggered or made at trial. Even in matters where there had been an objection raised to co-conspirator testimony, the Court of Appeals has not required explicit findings of existence of conspiracy and membership of the accused in upholding admissibility. United States v. McGlory, 968 F.2d 309, 334 n. 15 (3d Cir. 1992); United States v. Cruz, 910 F.2d 1072, 1081 (3d Cir. 1990) (citing United States v. Ammar, 714 F.2d 238, 247 (3d Cir. 1981) (rejecting appellant's claim that the court failed to make a finding of defendant's participation in the conspiracy before submitting co-conspirator statements to the jury).

Nonetheless, the Court made findings in connection with the

in error because it did not require the jury to first find that
Mashon knowingly and intentionally joined the conspiracy before
considering such statements against her. (Br. of M.O. 36-37.)

The Court finds no support for Mashon's argument. The
Court's instructions followed the Third Circuit's Model Jury
Instruction on Acts and Statements of Co-Conspirators, which
omit any reference to the basis of admissibility of co-
conspirator statements. See Third Circuit Model Criminal Jury
Instructions § 6.18.371K. In fact, the comments to the Third
Circuit's Model Criminal Jury Instructions make clear that the
Court need not instruct the jury on prerequisites before
considering co-conspirator statements that have already been
admitted into evidence at trial. The comments specifically state
that "[t]he court need not instruct regarding each prerequisite
of admissibility of a co-conspirator statement, after the court
has deemed such a statement admissible." Comments to the Third
Circuit's Model Jury Instruction § 6.18.371K.

---

parties' Rule 29(a) motions for judgment of acquittal at the
close of the government's case – and long before the matter was
submitted to the jury – that there was sufficient evidence from
which a jury could find beyond a reasonable doubt that the
charged conspiracy existed and that each defendant was a member
of it. (9/30 T. 1941:9-1946:4.)
    Since the present motion directs itself to the correctness
of the jury instruction on co-conspirator statements, rather
than the admissibility of any such evidence, this opinion will
focus upon the instructions given.

Indeed, it would not have been appropriate for a jury to make a second determination on the admissibility of co-conspirator statements. As the comments specifically note, it is the duty of the judge, not the jury, to decide whether the prerequisites for admissibility have been met. Comments to the Third Circuit's Model Jury Instruction § 6.18.371K (citing Bourjaily v. United States, 483 U.S. 171, 175 (1987)). Because the statements being considered by the jury have already been admitted into evidence, the jury instructions do not need to go into the "unnecessary explication of the basis of admissibility." Id. Any additional instruction on admissibility would have risked creating confusion with the jury.

The Court thus gave Instruction No. 36, "Conspiracy – Statements of Co-Conspirators" as follows:

> Evidence has been admitted in this case that certain persons, who are alleged to be co-conspirators of Nancy Wolf-Fels, Dwayne Onque, and Mashon Onque, said certain things.  The statements of any member of a conspiracy are treated as the statements of all the members of the conspiracy, if these statements were spoken during the existence of the conspiracy and to further the objectives of the conspiracy.
> Therefore, you may consider as evidence against Nancy Wolf-Fels, Dwayne Onque, and Mashon Onque, statements made by members of the alleged conspiracy, during the existence of and to further the objectives of the conspiracy.  You may consider these statements even if they were made in the defendant's absence and without his or her knowledge.  As with all the evidence presented in this case, it is for you to decide whether you believe this evidence and how much weight to give it.

Statements made by an alleged co-conspirator during the course of the charged conspiracy but before a particular defendant joined the alleged conspiracy may also be considered by you as evidence against a defendant. However, statements made before the alleged conspiracy began or after it ended may not be considered by you as evidence against defendants who are on trial.

(Jury Instr. [Docket Item 214] No. 36, at 46.) Contrary to Mashon's argument, the Court instructed the jury that a defendant could not be convicted of conspiracy unless that defendant's membership in the conspiracy was proved beyond a reasonable doubt. Thus, the Court gave Instruction No. 29, "Conspiracy – Membership in the Agreement," instructing among other things that "the government must prove beyond a reasonable doubt, as to that defendant, that the defendant knowingly and intentionally joined that agreement or conspiracy during its existence." (Id. No. 29, at 37.) That instruction continues for one and a half pages to emphasize the requirements for the Government to prove and the jury to find a defendant is a member. (Id. at 37-38.) The jury thus knew, before having the instruction on statements of co-conspirators, that if Mashon Onque was not a knowing member, she could not be regarded as a conspirator. Instruction No. 36 correctly stated: "The statements of any member of a conspiracy are treated as the statements of all the members of the conspiracy, if these statements were spoken during the existence of the conspiracy

36

and to further the objectives of the conspiracy." It was not necessary to again define what was meant by the term "member of the conspiracy" because that had already been done.[4]

The Third Circuit has rejected an argument that the trial court should have instructed the jury to consider a co-conspirator statement only if it found independent evidence of the conspiracy. The Court of Appeals has held that such an instruction was not necessary and explained that "[o]nce the judge as made the initial determination of admissibility, the jury should not be given an opportunity to second-guess his decision." United States v. Bey, 437 F.2d 188, 191-91 (3d Cir. 1971) (citing United States v. Geaney, 417 F.2d 1116 (2d Cir. 1969) and United States v. Ragland, 375 F.2d 471 (2d Cir. 1967)). In other cases, the Third Circuit has noted that it is appropriate to omit from the jury instructions an instruction on the factual foundation for admitting a co-conspirator statement. See United States v. Pungitore, 910 F.2d 1084, 1147 (3d Cir. 1990); United States v. Continental Group, 603 F.2d 444, 459 (3d Cir. 1979) (noting that jury instruction was "superfluous" when it instructed the jury on the sufficiency of independent

---

[4] The very first instruction to the jury was to consider and apply all instructions "as a whole. Each part of them is to be considered and applied with all other parts of these instructions. Therefore, you should not pick out any one particular aspect of these instructions and apply it without considering all of the others." (Jury Instr., No. 1,

evidence to prove membership in conspiracy before considering statements by co-conspirators against a particular defendant).

Mashon's citation to <u>United States v. McGlory</u>, 968 F.2d 309 (3d Cir. 1992) is inapposite because <u>McGlory</u> states the requirements for admitting co-conspirator statements under Federal Rule of Evidence 801(d)(2)(E). <u>McGlory</u> does not require the jury to make that same finding prior to considering the statements. Accordingly, the Court finds that the instruction given to the jury on co-conspirator statements was not erroneous.

### vi. 404(b) Evidence about Mashon Onque's Involvement in Uncharged Real Estate Transactions was Properly Admitted

Finally, Mashon argues that the evidence of her involvement in previous fraudulent real estate transactions should have been excluded under Federal Rule of Evidence 404(b). (Br. of M.O. 40-44.) The admission of prior "bad acts" under Rule 404(b) must follow four guidelines: (1) the evidence must have a proper purpose under Rule 404(b); (2) it must be relevant; (3) its probative value must outweigh its potential for unfair prejudicial effect under Rule 403; and (4) the Court must charge the jury to consider the evidence only for the limited purpose for which it is admitted. <u>Huddleston v. United States</u>, 485 U.S.

---

"Introduction," at 1.)

681, 691–92 (1988); United States v. Console, 13 F.3d 641, 659
(3d Cir. 1993).

The Court instructed the jury that the evidence of prior
transactions could be considered for the limited purpose of
showing an ongoing conspiratorial relationship; the absence of
mistake; method of operation; or state of mind, knowledge, and
intent to commit the crime. (10/1 T. 2020:13–2021:10.) The prior
transactions were indeed relevant for those purposes at trial.
That Mashon participated in additional fraudulent transactions
tended to make more likely the fact that Mashon was not an
unwitting participant. The evidence was also probative of the
manner in which the conspiracy was carried out, since the
uncharged transactions shared distinctive similarities with the
charged ones. Finally, contrary to Defendant's contention, the
evidence was probative of Mashon's conspiratorial relationship
with Ricks. Because Mashon had previously participated in
similar fraudulent transactions with the same person, it
explained why Ricks did not need to be explicit with Mashon
about what to do. The Government emphasized this point in
particular in its closing argument, noting Rick's testimony that
"[a] lot of things once it started were unspoken," and that
"[o]nce the ball gets rolling it's easier to do the next deal."
(10/2 T. 2093:7–23.) Because the references at issue were
probative of "material issue[s] other than character," they were

39

admissible under Rule 404(b). See United States v. Patela, 578
Fed. Appx. 139, 142 (3d Cir. 2014) (Rule 404(b) evidence that
defendant previously submitted false loan applications and made
misrepresentations before a bankruptcy court was not improperly
admitted because it rebutted claims of ignorance and mistake and
demonstrated defendant's capacity to knowingly perpetrate fraud
without assistance from a co-conspirator).

The Rule 404(b) evidence was probative and not unduly
prejudicial. The Court cannot say that the prejudicial impact
"substantially outweighed" its probative value in this case. The
three previous transactions involving similar persons and
similar acts were highly probative in demonstrating Mashon's
relationship with Ricks and her knowledge of the conspiracy, an
issue which Mashon strenuously contested at trial. United States
v. Holck, 398 F. Supp. 2d 338, 371 (E.D. Pa. 2005) (noting that
evidence that is highly probative is "exceptionally difficult"
to exclude). What's more, the Third Circuit has previously held
that evidence of a defendant's previous participation in a drug
conspiracy, undoubtedly more prejudicial than what was admitted
in this case, was not unduly prejudicial to establish knowledge
of a charged conspiracy. See, United States v. Vega, 285 F.3d
256, 262 (3d Cir. 2002).

Defendant argues in particular that the admission of three
checks to Dwayne cashed by Mashon was unfairly prejudicial

40

because Agent Stefanowicz testified that he had no evidence the checks were payment for an illegal act. The Court disagrees. Evidence that Mashon Onque made deposits of her brother's checks around the same time she participated in a fraudulent transaction with her brother is circumstantial evidence that Mashon benefited financially from the scheme and is probative of Mashon's motive, knowledge, and intent. Defendant's motion to vacate on this ground will be denied.

### C. **Dwayne Onque**

Like Mashon, Dwayne Onque argues that the evidence did not support his conviction; the willful blindness instruction was improper; and the Government's summary charts were improperly admitted. The Court will deny Dwayne's motion on improper admission of the summary charts for the reasons already set forth in Part III.B.iv. The Court will address Dwayne's other arguments below.

### i. **The Evidence was Sufficient to Sustain the Conviction and the Verdict was not against the Weight of the Evidence**

Dwayne Onque challenges his conviction on the grounds of insufficiency of evidence under Federal Rule of Criminal Procedure 29(a) and weight of the evidence under Rule 33. He argues that the evidence did not support his convictions for conspiracy because it failed to establish that he possessed actual knowledge of any conspiracy, or that he was willfully

41

blind to it. (Br. of Dwayne Onque ("Br. of D.O.") 4-6, 7-9.) For
support, Dwayne points only to Ricks' testimony that Dwayne "was
just a buyer" and was not a major player in the conspiracy,
which Ricks stated was between Henry, and Tarsia, and himself.
(9/22 T. 1097:17-1098:1; 9/22 T1099:4-6; Br. of D.O. 8-9.)

The Court does not agree. Knowledge of a conspiracy "may be
inferred from conduct that furthered the purpose of the
conspiracy," United States v. McKee, 506 F.3d 225, 241 (3d Cir.
2007), and there was sufficient evidence presented at trial
showing how Dwayne's actions were integral to the success of the
scheme. The evidence showed that Dwayne signed fraudulent loan
applications, attended closings and signed fraudulent closing
documents and HUD-1 forms, and received money from lenders for
the purchase of property. By inducing lenders to release funds
based on false information, Dwayne's actions directly furthered
the purpose of the conspiracy.

Dwayne participated in five different loan applications and
attended five separate real estate closings. While the number of
transactions does not by itself prove Dwayne's knowledge, it
makes it more likely that Dwayne knew the true nature of the
business, and that this was a calculated and deliberate decision
to participate. United States v. Claxton, 685 F.3d 300, 310 (3d
Cir. 2012); United States v. Chaffo, 452 Fed. Appx. 154, 160 (3d
Cir. 2011); United States v. Kapp, 781 F.2d 1008, 1011 (3d Cir.

42

1986). Repeatedly performing as a straw buyer negates the argument that he was just keeping bad company or was in the wrong place at the wrong time.

There was also evidence at trial showing that Dwayne knew he was misrepresenting information in order for the transactions to go through. The Government presented testimony that Dwayne told investigators he allowed Ricks and Tarsia to deposit money into Dwayne's bank account in order to "make it appear that he had a certain balance in his account in order for the purchases to go through." (9/29 T1725:16-23.) Dwayne also stated that he knew Ricks and Tarsia had inflated his salary on the mortgage application. Finally, the Government presented evidence that Dwayne asked his former boss to "inflate" his job title if someone connected with his mortgage application called to ask about his real estate purchases. (9/29 T1726:4-8; 9/22 T1149:1-12.) Dwayne's continued participation in the scheme when he knew fraudulent information was being used strongly implicates him, and negates Defendant's argument that he was merely "negligent in signing papers without reading them." (Br. of D.O. 5.)

Knowledge may also be inferred from evidence of "excessive financial gain," see United States v. Pearlstein, 576 F.2d 531, 542 (3d Cir. 1978), and in this case, Dwayne made a considerable amount of money by entering into dealings with Ricks. Testimony from Agents Stefanowicz and Smith as well as Ricks all showed

43

that Dwayne made between $10,000 to $15,000 for each property in

which Ricks "use[d] his name and credit." (9/29 T. 1725:6-8.) In

total, Dwayne received $75,000 for the five closings over a

period of nine months (9/11 T. 411:5-412:1.), which was more

than his entire year's salary as a truck driver.

Taken together, the evidence above is more than sufficient

for a rational jury to find that Dwayne had knowledge of the

criminal enterprise. See United States v. Anderskow, 88 F.3d

245, 253 (3d Cir. 1996) (defendant's knowledge that advance fees

violated contractual obligations and ethical duties to

customers, false excuses given to customers, and evidence of

defendant's financial gain from the scheme was sufficient to

show defendant was a knowing and willing participant in a scheme

to defraud).

Accordingly, the Court will deny Defendant's motion for

acquittal under Rule 29(a). The Court reaches the same result

when viewing the evidence neutrally under Rule 33. Because the

verdict was not against the weight of the evidence and the Court

is not convinced that this case presents a serious danger that

an innocent man has been convicted, the Court will deny Dwayne's

motion for a new trial based on weight of the evidence.

### ii. Whether the Willful Blindness Jury Instruction was Reversible Error

Like Mashon, Dwayne also challenges the Court's willful

44

blindness jury instruction, arguing that the evidence showed only that Dwayne was negligent in his conduct. The Court holds that a willful blindness instruction was appropriate as applied to Dwayne because there was sufficient evidence that he suspected and deliberately ignored the criminal conspiracy.

The Government presented evidence that Dwayne closed on five real estate transactions in 9 months using loan applications with falsified information. Even if Dwayne believed at the beginning that he and Ricks were going into a legal business of buying and selling properties for profit, he could not have believed it by the end. As already noted above, the evidence showed that Dwayne knew Ricks was falsifying mortgage applications in Dwayne's name in order to get approval for the loans. Instead of withdrawing, Dwayne continued to partner with Ricks. At Ricks' behest, he also asked his employer to lie so that his loan application could be approved, and accepted money into his bank account knowing that it would be used to deceive lenders.

It was clear that Dwayne's actions went beyond mere negligence, for they show that he was at the very least aware of his role in the deception and of the high probability that the conduct was criminal. Yet he allowed the activity to continue, received a significant amount of money for his participation, and refused to ask any questions about the legality of the

scheme. The willful blindness instruction with respect to Dwayne therefore did not constitute reversible error. See United States v. Ugwu, 539 Fed. Appx. 35, 38-39 (3d Cir. 2013) (rejecting the defendant's argument that a willful blindness instruction was unjustified where there was evidence that the defendant signed false HUD-1 statements, received deposits greater than the amount listed on the HUD-1, signed funds over to a co-conspirator, and lied about purpose of the transfer); United States v. Stadtmauer, 620 F.3d 238, 259 (3d Cir. 2010) (willful blindness instruction was appropriate where defendant, who was "intimately involved with the operations of the partnerships" failed to ask questions despite his awareness of a high probability that the partnerships' tax returns contained false information); United States v. Rickard, 336 Fed. Appx. 235, 241 (3d Cir. 2009) (willful blindness instruction justified where defendant in mortgage fraud scheme who participated in fraudulent closings received funds well in excess of money she was due).

Even if the willful blindness instruction had been erroneously given, the error was harmless. There was sufficient evidence in the record from which a jury could have concluded that Dwayne Onque had actual knowledge of wrongdoing, so any error did not prejudice him. See Stadtmauer, 620 F.3d at 260 n. 26 (willful blindness instruction, even if given in error, was

not prejudicial because there was "ample evidence" of defendant's actual knowledge); Ugwu, 539 Fed. Appx. at 39.

### D. **Nancy Wolf-Fels**

Wolf-Fels' motion for a new trial centers around what she alleges is newly-discovered evidence of the source of a single check that was admitted into evidence at trial.

At trial, as evidence that Wolf-Fels was compensated for her role in the conspiracy as a loan officer, the Government introduced checks that Wolf-Fels received. The checks, from Darryl Henry to Nancy Wolf-Fels, were written in February, April, and June of 2004 in the amounts of $7,000, $5,700, and $5,000. (Gov't Exs. 2203, 2304, 2400.) Darryl Henry testified that all three checks were given to Wolf-Fels for her participation in the conspiracy. (9/15 T. 484:14-485:1; T. 493:9-23; T. 502:10-503:5.) Another co-conspirator who testified at trial, Donald Cromwell, Jr., provided somewhat contradictory testimony as to one of the checks. On cross-examination, he stated that he had borrowed $5,000 from Wolf-Fels to buy a car, and that he paid Wolf-Fels back by asking Henry to write her a check for that amount. (9/17 T. 913:20-914:18.)

Wolf-Fels now argues that a new trial should be granted because of newly-discovered evidence. In a certification to the Court, Wolf-Fels states that, after the trial was over, she found a roofing invoice among her late husband's records, which

47

were stored in the attic of her house. (Wolf-Fels Cert. [Docket Item 231] ¶ 4.) The invoice, appended to Defendant's brief, is dated March 23, 2004 and Wolf-Fels contends that it is signed by her late husband, Robert J Fels Jr., who owned a roofing company. The following appears in the description box:

    Re-Roof
    101 Hillcrest, Maplewood, NJ
    Plywood, Nails, [illegible] shingles

(Fels Invoice [Docket Item 231].) The invoice notes that the total amount due is $5,700. Wolf-Fels alleges that Darryl Henry, who owned 101 Hillcrest at the time the invoice was written, owed Wolf-Fels' husband $5,700 for roofing services, and his April 2004 check to Wolf-Fels for $5,700 was therefore payment for this debt. She contends that her conviction cannot stand because (1) this evidence demonstrates that Henry perjured himself at trial when he stated that the checks to Wolf-Fels were payment for her role in the conspiracy; and because (2) the invoice is newly-discovered evidence that would have changed the outcome at trial. (Br. of Nancy Wolf-Fels ("Br. of N.W.") 4-6.)

### i. A New Trial is not Warranted on the Basis of Allegedly Perjured Evidence

The use of perjured testimony may provide a basis for a new trial. To grant a new trial on this ground, the court must be satisfied that: (1) the testimony given by a material witness was false; (2) without the testimony the jury might have reached

48

a different outcome; and (3) the party seeking a new trial was taken by surprise when the false testimony was given and was unable to meet it or did not know the falsity of it until after the trial. United States v. Meyers, 484 F.2d 113, 116 (3d Cir. 1973); United States v. Massac, 867 F.2d 174, 178 (3d Cir. 1989). Wolf-Fels argues that Cromwell's testimony that Henry gave $5,000 to Wolf-Fels in repayment for a loan combined with new evidence of a $5,700 roofing invoice to Henry establishes that Henry committed perjury when he testified that both checks he wrote to Wolf-Fels were for her participation in the conspiracy.

The Court is not convinced that a new trial is required. First, the Court is not persuaded that Defendant's cited evidence shows that Henry's testimony was false. Evidence proving that a witness testified falsely to satisfy the first prong must be more than evidence that merely impeaches. See, e.g., United States v. McLaughlin, 89 F. Supp. 2d 617, 622 (E.D. Pa. 2000) (finding that witness perjured himself where his testimony that he had no knowledge of a trust account contradicted his own worksheet with entries from the trust account). Cromwell's explanation of why Henry paid to Wolf-Fels merely contradicted Henry's testimony; it clearly did not prove Henry's testimony false. It was entirely within the jury's province to consider both statements and assign weight to each

Case 1:10-cr-00510-JBS   Document 252   Filed 02/09/15   Page 50 of 59 PageID: 3606

witness's testimony. Likewise, the roofing invoice is far from proof that Henry was lying. The evidence only showed that Henry owed money to Robert Fels around the time Wolf-Fels received a check. There is no evidence that Robert Fels's invoice was actually given to Henry; that Henry paid it; and, most significantly, that Henry was paid in an unusual manner, in the form of a check made out to Nancy Wolf-Fels rather than to the business itself, Roofing Services, or its owner, Robert Fels, who was still alive in 2004.

Nor is the Court convinced that the second prong has been satisfied because a jury could have relied on other independent evidence to establish Wolf-Fels' connection to the conspiracy beyond a reasonable doubt. For example, the jury saw evidence of a third check Henry had written to Wolf-Fels in the amount of $7,000, which Henry testified was payment for Wolf-Fels' role in the fraud. And at trial, Henry testified specifically to Wolf-Fels' knowledge and role in the conspiracy:

> Q. And how did you introduce [Wolf-Fels] as -- what did you introduce her as?
> A. I told them that Fels and I worked in the past and who would cooperate with conducting the mortgage procedure the same way that the people they had were doing.
> Q. What did you mean by that, conducting the procedure the way it had been done in the past?
> A. To help us structure it fraudulently so we could get the properties closed.
> . . .

50

> Q. You didn't have to worry about Ms. Wolf-Fels
> telling anyone that you were essentially proposing a
> fraud, is that correct?
> A. Correct.

(9/15 T. 528:12-530:8.) Moreover, Henry's testimony about Wolf-

Fels' part in the conspiracy was corroborated by a number of

other witnesses. Jerry Smith testified that Henry told him that

Wolf-Fels was "[Henry's] mortgage person" and "the one that gets

things done for [Henry.]" (9/29 T. 1639:2-7.) He also testified

that he had numerous phone conversations with Wolf-Fels and

> If [loan] documents were not correct, [Wolf-Fels]
> would basically say this guy doesn't make enough, you
> got to – this is what it should be saying or if it was
> an incorrect number or statement on a document, she
> would basically say this is not good, you need to take
> this back and do it over.

(9/29 T.1639:9-14; see also 9/29 T. 1642:20-1643:6.) James

Ezeilo, another co-conspirator, testified to Wolf-Fels'

participation in the conspiracy and to speaking on the phone

with her about "creative financing" to make sure a fraudulent

deal closed. (9/22 T. 1273:4-1274:25.) Cromwell, Timothy Ricks,

and Elizabeth Hidalgo all corroborated Henry and Smith's

testimony that Wolf-Fels put together false loan applications

for lenders and had conversations about the necessity of

inflating salary assets on loan applications. (See, e.g., 9/16

T. 829:2-13; 9/17 T. 858:22-860:13; 9/22 T. 1061:10-16.) Because

there was substantial other evidence on which to convict Wolf-

Fels, Henry's testimony about Wolf-Fels' receipt of two checks,

even if false, would not have affected the jury's judgment "in any reasonable likelihood." United States v. Freeman, 763 F.3d 322 (3d Cir. 2014); see also United States v. Leary, 206 Fed. Appx. 111, 115 (3d Cir. 2006) (impeachment evidence may support a new trial only if it "'would have undermined a critical element of the prosecution's case.'" (quoting United States v. Wong, 78 F.3d 73, 79 (2d Cir. 1996)).

Finally, Wolf-Fels cannot satisfy the third prong because she had ample notice and opportunity to confront Henry's allegedly false testimony at trial. Indeed, Cromwell's testimony was elicited by Wolf-Fels' own counsel during cross examination, after Henry testified. The fact that the exact evidence which Wolf-Fels now alleges proves Henry's testimony false was brought out at trial by Wolf-Fels' attorney eliminates any doubt as to whether Wolf-Fels had a fair opportunity to meet Henry's testimony.

Nor can Wolf-Fels convincingly claim that she was taken by surprise when she heard the testimony about the checks, because Wolf-Fels had long had notice that the Government possessed these checks and intended to introduce them at trial as evidence of an ongoing conspiratorial relationship. The Government filed a motion to admit evidence in February 2014, seven months before trial, stating explicitly that "Darryl Henry will testify that Wolf-Fels was paid thousands of dollars from Henry's real estate

company – shortly after closing" on three fraudulent transactions in February and April of 2004. (Feb. 20, 2014 Letter to admit additional 404(b) evidence [Docket Item 146] 2). These checks were produced to Wolf-Fels during discovery. The Government also sent an Exhibit List to counsel prior to trial, which listed the exact checks the Government intended to introduce. (Gov't Br. 40.)

Because the Court is not satisfied that Defendant has met any of the requirements for a new trial based on allegedly perjured testimony, Defendant's motion will be denied.

### ii. A New Trial is not Warranted on the Basis of Newly Discovered Evidence

The existence of newly discovered evidence may provide an independent basis for a new trial. To succeed on such a motion, the defendant must meet five requirements: (a) the evidence must be newly discovered since the trial; (b) failure to learn of the evidence must not have been caused by the defendant's lack of diligence; (c) the evidence must not be merely cumulative or impeaching; (d) the evidence must be material to the issues involved; and (e) it must be of such nature that, on a new trial, the newly discovered evidence would probably produce an acquittal. United States v. Kelly, 539 F.3d 172, 181 (3d Cir. 2008) (citing United States v. Iannelli, 528 F.2d 1290, 1292 (3d Cir. 1976)); United States v. Meyers, 484 F.2d 113, 116 (3d Cir.

1973). Although the decision whether to grant a new trial lies within the discretion of the Court, the movant has a "heavy burden" of proving each of these requirements. United States v. Cimera, 459 F.3d 452, 458 (3d Cir. 2006) (quoting United States v. Saada, 212 F.3d 210, 216 (3d Cir. 2000). The Third Circuit has noted that "[c]ourts should 'exercise great caution in setting aside a verdict reached after fully-conducted proceedings,' and particularly so where 'the action has been tried before a jury.'" Kelly, 539 F.3d 172, 181 (3d Cir. 2008) (quoting United States v. Kamel, 965 F.2d 484, 493 (7th Cir. 1992)).

Before newly-discovered evidence can be a basis for a new trial, it must, as a threshold matter, be admissible evidence. There is grave doubt of the authenticity of the alleged invoice. The invoice lists no customer name, no invoice number, no sales tax, no description of the shingles to be used, no deposit, no address for the customer, and no reflection that payment was received. The document would have a hard time passing muster under Rule 803(6) for business records and Rule 902 for authenticity, and the circumstances of its post-trial discovery also erode indicia of reliability. Moreover, it would certainly be odd for a payment of such an invoice to be by a check payable to the contractor's wife and deposited to her individual account, so the fact of the $5,700 payment lends no

corroboration to the authenticity of this document. Despite these obvious impediments to admissibility, the Court will, for purposes of this motion, assume that the invoice could be admissible if there were a retrial.

Wolf-Fels cannot satisfy these five Iannelli requirements. First, Wolf-Fels cannot establish that the newly discovered evidence would likely produce an acquittal at a new trial. As an initial matter, it is doubtful whether the invoice would even be admitted into evidence. The statements in the invoice are hearsay, and it is unclear whether anyone would have been able to authenticate the document as a business record under Federal Rule of Evidence 803(6). Moreover, even if the roofing invoice could be admitted, as the Court has already explained, it would not overcome the substantial independent evidence that exists to show Wolf-Fels' knowledge of and participation in the conspiracy. See Saada, 212 F.3d at 217 n.6 (court must deny a new trial motion "[w]here there is sufficient independent evidence to sustain a finding of guilt."). Mostly importantly, receipt of these payments is not an essential element of the crime for which Wolf-Fels was convicted, namely, conspiracy to commit wire fraud.

Nor can Wolf-Fels satisfy the second prong. The focus of the diligence inquiry is on "whether the evidence at issue could have been discovered before or at the time of trial with the

exercise of reasonable diligence on behalf of the defendant and/or his counsel." Kelly, 539 F.3d 172, 182 (3d Cir. 2008); United States v. DeRenewal, 10 F.3d 100, 104 (3d Cir. 1993). To show diligence, "facts must be alleged from which the court may infer diligence on the part of the movant." United States v. Cimera, 459 F.3d 452, 461 (3d Cir. 2006).

Here, it is clear that despite ample notice, Wolf-Fels exercised no diligence at all in looking for the roofing invoice before trial. The Government contends – and Wolf-Fels does not dispute – that the checks introduced at trial were provided to Wolf-Fels in discovery in September 2012. As noted above, the check was also the subject of a pre-trial *in limine* motion which the Government filed in February of 2014, and it was on the Government's Exhibit List sent to counsel in August 2014. (Gov't Br. 40; Feb. 20, 2014 Letter to admit additional 404(b) evidence [Docket Item 146] 2.) Wolf-Fels was therefore on notice long before trial that the Government intended to introduce these checks as evidence of the payments she had received from Henry for participating in the scheme. She provides no explanation for why she could not have searched her files once she was put on notice in 2012, two years before trial, or once it became clear eight months before trial that the Government was seeking to use the checks at trial.

Indeed, the roofing invoice would have been found with even

a moderate amount of diligence. Common sense would have dictated that Wolf-Fels was going to have to provide an explanation for the checks, and old invoices from her husband's roofing business might shed some light, particularly where the evidence here suggests that Wolf-Fels claims she received checks in her name for payment for her husband's work.

Even if the Court were inclined to believe Wolf-Fels' statement that she did not think to look through her husband's files until she heard Henry's testimony, (Wolf-Fels Cert. ¶ 4), that explanation still does not explain why she could not have searched her husband's files while the trial was ongoing. Henry's roofing connection to Wolf-Fels' late husband was known to the defense at trial. Henry was specifically asked on the fifth day of trial by Wolf-Fels' attorney whether he had ever employed Wolf-Fels' husband to do roofing work. (9/15 T. 601:18-23.)[5] There was no obstacle which prevented her from getting to the invoice during the three weeks following Henry's testimony, since Wolf-Fels noted herself that the roofing invoice was merely in the attic of her house. (Wolf-Fels Cert. ¶ 4.) The Court finds no reasonable excuse for Wolf-Fels' lack of effort and must conclude that Wolf-Fels has not satisfied the

---

[5] The fact that Wolf-Fels' attorney asked this specific question while interrogating Henry about checks to Wolf-Fels suggests that Wolf-Fels suspected the check's connection with her husband's roofing business even before that particular day.

requirement of diligence.

Although the reasons provided above are sufficient to deny Wolf-Fels' motion, the Court notes that the new evidence also fails the third prong of the test because it is merely impeaching. To be considered not merely impeaching, newly discovered evidence must have a "strong exculpatory connection" with the evidence presented at trial or must throw "severe doubt" on critical inculpatory evidence. United States v. Quiles, 618 F.3d 383, 393 (3d Cir. 2010).[6] The roofing invoice relates only to a single check, which was admitted under Rule 404(b) for the limited purpose of showing an ongoing conspiratorial relationship, state of mind, knowledge, and intent. As such, it is hardly "critical inculpatory evidence." Even if it tends to weaken Henry's credibility, it does not throw doubt on the testimony of Hidalgo, Cromwell, Smith, and others, all of whom testified to Wolf-Fels' role in the conspiracy, a fact that Defendant's brief ignores.

The Court holds that Defendant has not proven that a new

---

(9/15 T. 601:18-24.)

[6] The Third Circuit case United States v. Saada, 212 F.3d 210, (3d Cir. 1999) illustrates the high bar that must be overcome to find that new evidence is not merely impeaching. In Saada, a witness who testified for the government pursuant to a cooperation agreement was later caught on tape advising a friend to give false testimony in exchange for a reduced sentence. The evidence greatly undermined the defendant's testimony, but the Court nevertheless found that the evidence was "only" impeaching because there was no "exculpatory connection" between the new

trial should be granted under Rule 33. Defendant's motion will therefore be denied.

**IV.  CONCLUSION**

For the reasons set forth above, Mashon Onque's motions for acquittal and for a new trial; Dwayne Onque's motions for acquittal and for a new trial; and Nancy Wolf-Fels' motion for a new trial are denied. An accompanying Order will be entered.


**February 9, 2015**                    **s/ Jerome B. Simandle**
Date                                    JEROME B. SIMANDLE
                                        Chief U.S. District Judge

---

evidence and the defendant's criminal acts. 212 F.3d at 216.